# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

TIMOTHY BLACK,

        Plaintiff,

    v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

_____/

Case No.  1:17-cv-01208-SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

## I.    INTRODUCTION

On September 7, 2017, Plaintiff Timothy Black ("Plaintiff") filed a complaint under 42 U.S.C. § 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the "Act").  (Doc. 1.)  Plaintiff filed his opening brief on June 25, 2018 (Doc. 16), and Defendant filed her opposition on October 11, 2018 (Doc. 24).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

///

---

[1]  The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 6, 9.)

## II.    FACTUAL BACKGROUND

On October 7, 2013, Plaintiff filed an application for SSI payments, alleging he became disabled on January 1, 2011, due to carpal tunnel syndrome, pain in his fused right ankle, arthritis, asthma, and sleep apnea.  (Administrative Record ("AR") 17, 43, 77, 85, 103, 111, 186–201, 208, 212, 225, 227, 240, 242.)  Plaintiff was born on August 7, 1961, and was 52 years old on the date his application was filed.  (AR 27, 39, 77, 85, 196, 208, 227, 242.)  He stopped attending school in the ninth grade.  (AR 39–40.)  Plaintiff has past work experience as a construction laborer and stock (saw) cutter.  (AR 26, 68, 213.)

### A.    Relevant Medical Evidence[2]

### 1.    Hospital Visits

In December 2012, Plaintiff underwent an open reduction and internal fixation (ORIF) surgery on a lateral malleolar fracture in his right ankle.  (AR 274–77.)  He was noted on January 7, 2013, to be "doing well" post-surgery and making "steady process," and was provided a short-leg CAM walker.  (AR 295.)  Plaintiff was advised "to not weight bear whatsoever."  (AR 295.)

On October 7, 2013, Plaintiff presented to the Emergency Department with complaints of trouble breathing for the last six months and a non-productive cough.  (AR 371.)  He denied a history of asthma.  (AR 371.)  Upon examination, he had normal respiratory effort but "[r]honchi throughout, with rare wheeze posteriorly," and "[f]requent cough."  (AR 373.)  Plaintiff was diagnosed with Chronic Obstructive Pulmonary Disease (COPD) exacerbation and, upon discharge, was provided antibiotics, albuterol, and prednisone.  (AR 374–76.)

Plaintiff presented to the Emergency Department on January 9, 2014, with a cough and difficulty breathing.  (AR 440, 443.)  His physical examination revealed chest pain with cough, shortness of breath, and low back pain.  (AR 443.)  A chest X-ray showed "bronchial cuffing" and suspected tracheobronchitis with "some coarse interstitial opacities in the lower lobes of uncertain chronicity."  (AR 439.)  On July 8, 2014, Plaintiff underwent a pulmonary function test, which was

---

[2] As Plaintiff's assertions of error are limited to the ALJ's consideration of the consultative examiners' opinions, the failure to obtain a consultative orthopedic examination, and the failure to consider Plaintiff was on the borderline between age categories for the purposes of applying the Medical-Vocational Guidelines, only evidence relevant to those arguments are set forth below.

normal.  (AR 455.)

### 2. Consultative Examiner Ritu Malik, M.D.

On July 1, 2014, Plaintiff presented for a comprehensive internal medicine evaluation by Dr. Malik at the request of Social Security.  (AR 448–50.)  Despite having denied a history of asthma in 2013 (AR 371), Plaintiff reported having asthma for "six to nine years," using an albuterol inhaler and nebulizer less than once a week, and having visited the emergency room three times in the past eight months.  (AR 448.)  He also reported bilateral knee pain, right greater than left, for "many years."  (AR 448.)  Plaintiff noted he had a right ankle fracture that was fixed with plates and screws, with chronic pain since 2010.  (AR 448.)  He further reported arthritis in his left wrist due to a previous surgery and numbness in his hands when he drives, leading him to conclude he has carpal tunnel syndrome.  (AR 448.)  Plaintiff stated he takes Tylenol and ibuprofen for pain.  (AR 448.)

Dr. Malik noted Plaintiff could sit down, stand up, and change position without difficulty. (AR 449.)  He could take off his socks but "did not want to put them back on because when he bends over he has left-sided abdominal pain."  (AR 449.)  Plaintiff could squat and rise but reported right knee and ankle pain while doing so.  (AR 449.)  He had a negative straight-leg raising test bilaterally but reported low back pain.  (AR 450.)  Dr. Malik observed Plaintiff had pain with range of motion in his left hip.  (AR 450.)  He had full range of motion in all joints except his left wrist, which had limited range of motion and pain.  (AR 450.)  Dr. Malik noted that Plaintiff became "winded" on physical exam, but "was able to recover with some rest."  (AR 449.)

Dr. Malik's diagnostic impression of Plaintiff was that he has: a"[h]istory of left wrist fracture with wrist pain"; a "[h]istory of right ankle pain"; "[s]elf-diagnosed carpal tunnel with negative Tinel's and Phalen's bilaterally," with described "parasthesias with driving"; "[b]ilateral knee pain, right greater than left"; and "[r]eport of asthma with history of multiple ER visits for same," finding that Plaintiff "does get winded but is able to recover in a short period of time."  (AR 450.)  With respect to Plaintiff's residual functional capacity ("RFC")[3], Dr. Malik opined that

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the

Plaintiff should be able to stand and/or walk for six hours in an eight-hour work day, sit for six hours in an eight-hour work day, lift and carry with no limitations occasionally and frequently, and had no visual, communicative or environmental limitations. (AR 450.) He noted that frequent bending, stooping, or crouching may exacerbate Plaintiff's ankle and knee pain, and that repetitive reaching, gross and fine handling, feeling, and grasping may exacerbate his wrist pain. (AR 450.) Dr. Malik concluded that Plaintiff did not need an assistive device for ambulation. (AR 450.)

### 3. Consultative Examiner Tomas Rios, M.D.

On July 22, 2014, Plaintiff presented for another comprehensive internal medicine evaluation. (AR 459–63.) Plaintiff complained of difficulty breathing, wrist pain, and "chronic pain" in his right knee and ankle. (AR 459.) He reported he developed breathing problems 10 years before, and that his symptoms are aggravated by sleep apnea. (AR 459.) Plaintiff used his inhaler treatment on a "fairly daily basis." (AR 459.) Plaintiff reported chronic wrist pain and having undergone an ORIF procedure on his right ankle, with continued pain on his right side. (AR 459.) Dr. Rios noted "severe respiratory compromise" in Plaintiff, and that he walked "favoring the right side" with a normal gait and a slight limp. (AR 460–61.) His straight-leg raising test was negative to 80 degrees bilaterally. (AR 462.) Dr. Rios's examination of Plaintiff's chest revealed expiratory wheezing, but no clubbing, cyanosis, or edema. (AR 462.) His right knee had fine crepitus without laxity of the joint and no effusion noted. (AR 462.) Plaintiff had tenderness in his right ankle along the medial compartment. The examination of both wrists by Dr. Rios showed good range of motion with negative Tinel sign. (AR 462.)

Dr. Rios diagnosed Plaintiff with reactive airway disease, degenerative joint disease, and status post-surgery on the right ankle. (AR 462.) He opined that Plaintiff should be able to stand and walk for six hours in an eight-hour period, lift and carry 20 pounds occasionally and 10 pounds frequently, and can perform occasional climbing and frequent balancing, stooping, kneeling, crouching and crawling. (AR 462–63.) According to Dr. Rios, Plaintiff should be precluded from working around chemicals, dust, fumes, and gases "on account of his history of reactive airway

effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

disease."  (AR 463.)  Dr. Rios found Plaintiff had no limitations on sitting and manipulative activities and did not need an assistive device.  (AR 463.)

### 4.    State Agency Physicians

On December 17, 2013, J. Linder, M.D., a Disability Determinations Service medical consultant, reviewed the record and concluded that there was "insufficient evidence" to evaluate his claim.  (AR 80–83.)  Upon reconsideration on July 24, 2014, another Disability Determinations Service medical consultant, Robert Mitgang, M.D., reviewed the record and assessed Plaintiff's physical RFC.  (AR 94–95.)  Dr. Mitgang opined Plaintiff was limited to kneeling and crouching occasionally, climbing and crawling frequently, and avoiding even moderate exposure to fumes, odors, dusts, gases, and poor ventilation.  (AR 94–95.)  According to Dr. Mitgang, Plaintiff had no other limitations.  (AR 94–95.)

### 5.    Treating Physician Kathleen Kearns, M.D.

On April 24, 2015, Plaintiff established care with Kathleen Kearns, complaining that he gets "increasingly winded" when riding his bike around town and that his right knee hurts when he walks.  (AR 468.)  Dr. Kearns noted that Plaintiff had full range of motion in his knee, but that it was enlarged and had crepitus.  (AR 468.)  She diagnosed him with chronic hepatitis C, osteoarthritis in his right knee, sleep apnea, shortness of breath likely caused by COPD, and fatigue due to obesity.  (AR 468.)

An X-ray of Plaintiff's right knee performed May 4, 2015, showed severe osteoarthritis.  (AR 515.)  Chest X-rays performed that same day were negative.  (AR 516.)

Plaintiff presented to Dr. Kearns on May 15, 2015, complaining of shortness of breath at times.  (AR 470.)  Dr. Kearns referred him to an orthopedist for a consultation for his severe osteoarthritis in his knee and advised him to use ibuprofen "sparingly".  (AR 470.)

On November 3, 2015, Plaintiff attended a follow-up appointment following his knee surgery.  (AR 500–04.)  He reported attending home physical therapy three times a week for his right knee.  (AR 500.)  Plaintiff also complained of lower leg pain, ankle pain, back pain, neck pain, and tingling in his left hand, on which he had surgery with pins "a long time ago."  (AR 500.)  He reported taking aspirin, Norco, and ibuprofen for pain.  (AR 500–501.)  Plaintiff was observed to

have limited range of motion in his left wrist with weakness in his grip compared to his right. (AR 501.) He also used a cane for ambulation and had a limp. (AR 501.)

Dr. Kearns completed a "Physical Residual Functional Capacity Questionnaire" on January 21, 2016. (AR 464–67.) She indicated Plaintiff's diagnoses of degenerative disc disease in his lumbar spine, chronic pain in his left wrist, osteoarthritis of the knee, and high blood pressure, with a "poor" prognosis. (AR 464.) Dr. Kearns noted that Plaintiff had a right knee replacement with "some improvement" and had "[n]o specific treatment" for his wrist or back "other than anti-inflammatories." (AR 464.)

Dr. Kearns opined Plaintiff could walk one-to-two blocks without rest or severe pain. (AR 465.) According to Dr. Kearns, Plaintiff could sit for 30 minutes without needing to get up, and could stand for 30 minutes before needing to sit or walk around. (AR 465.) Plaintiff could stand/walk about two hours, and sit at least six hours, in an eight-hour workday. (AR 466.) He must walk for five minutes every 30 minutes. (AR 466.) Dr. Kearns indicated that Plaintiff did not need a cane or other assistive device for walking. (AR 466.) Plaintiff could frequently lift less than 10 pounds with his left hand and never more weight than that. (AR 466.) He could frequently look down, turn his head right or left, look up, and hold his head in a static position. (AR 466.) According to Dr. Kearns, Plaintiff could occasionally twist, and rarely stoop, crouch, or climb. (AR 467.) Dr. Kearns opined Plaintiff has "significant limitations" with reaching, handling, or fingering with his left hand. (AR 467.)

**6.    Treating Orthopedist John Casey, M.D.**

On August 4, 2015, Plaintiff presented for an orthopedic consultation with Dr. Casey. (AR 475–81.) Plaintiff reported a 10-year history of pain in his right knee that had become so severe he cannot walk greater than a mile without pain. (AR 475.) He further reported that he is unable to sleep without pain. (AR 475.) Dr. Casey noted Plaintiff had not yet tried any conservative therapies. (AR 475.) Upon examination, Plaintiff had a "significant varus malalignment of the right knee, severe medial and lateral joint line tenderness, and unrestricted active range of motion that is painful at extremes." (AR 476.) Plaintiff's passive range of motion had "significant patellofemoral crepitus." (AR 476.) After having reviewed the X-rays of Plaintiff's right knee, Dr. Casey advised

Plaintiff that "given the severity of his disease" he did not believe "conservative treatment would be beneficial at this time." (AR 476.) Plaintiff agreed to proceed with a total knee arthroplasty. (AR 476.)

Plaintiff underwent a right total knee replacement on October 14, 2015. (AR 484, 486–88, 495–97.) He had an "uneventful postoperative course" and was discharged to home health on October 17, 2015. (AR 484.) On the date of discharge, Plaintiff was ambulating more than 500 feet. He was prescribed aspirin and Norco and was advised to bear weight as tolerated. (AR 484.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on January 3, 2014, and again on reconsideration on July 24, 2014. (AR 103–107, 111–15.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 117–24.) At the hearing on March 8, 2016, Plaintiff appeared with counsel and testified before an ALJ as to his alleged disabling conditions. (AR 38–66.)

**1.    Plaintiff's Testimony**

Plaintiff testified that his thumb and ankle "cause him the most problems" in his daily life. (AR 43.) He stated that he previously broke his ankle "in two places" and had a plate and eight screws inserted. (AR 43.) Plaintiff testified that he cannot walk a full block without it "killing" him. (AR 44.) He was prescribed ibuprofen, which helps lessen the pain. (AR 44–45.) Plaintiff received no physical therapy or injections for his ankle, but was recommended exercise in the form of walking and riding a bicycle. (AR 45.) He testified he rides a bike but "no more than a mile." (AR 46.) Later in the hearing, however, Plaintiff testified that he no longer rides his bike. (AR 66.)

Plaintiff reported that his knee was "sore" but "going pretty good" and "better than it was." (AR 48.) Plaintiff was in the hospital for four days after his knee replacement surgery and had a physical therapist come to his home twice a week for a month and a half. (AR 63.) He testified that he thereafter had outpatient therapy twice a week. (AR 63.) He testified he cannot get on his hands and knees and that his "whole leg hurts" when he walks. (AR 48, 64.) Plaintiff used a cane at the hearing and testified that he uses it "[a] couple times a week," both inside and outside his home. (AR 49.) He testified he cannot walk more than half a block with his cane because his "ankle starts

killing [him]" and his "whole leg" hurts.  (AR 49.)  Plaintiff's use of a cane to walk predated his knee surgery.  (AR 62.)  He used a walker about a month following his knee surgery, then switched to a cane.  (AR 65.)  According to Plaintiff, he cannot be on his feet for more than 10 or 15 minutes before having to sit down.  (AR 75.)

Plaintiff testified he has an inhaler for asthma that he uses three times a week.  (AR 50.)  He also used a nebulizer a month before and went to the emergency department five or six weeks for asthma.  (AR 51–52.)  Plaintiff testified he has a CPAP machine that he uses "most nights" to treat his sleep apnea.  (AR 52.)  With respect to his thumb, Plaintiff testified he had surgery on it about 10 years prior, and discussed with his doctor the possibility of having additional surgery.  (AR 47.)  No physical therapy or injections were recommended for Plaintiff's thumb.  (AR 47.)  Plaintiff has not been formally diagnosed with carpal tunnel syndrome and has received no treatment for it.

Plaintiff was 54 years old on the date of the hearing.  (AR 39.)  He testified he lives in a room in his sister's garage.  (AR 52–53.)  He can bathe and dress himself but needs help putting his shoes and socks on.  (AR 53.)  He can use a microwave, make hot dogs and prepare sandwiches, and sometimes barbecue.  (AR 54.)  Plaintiff testified he can load the dishwasher, sweep, and do laundry.  (AR 54–55.)  He watches television "almost all day."  (AR 55.)  He uses email and Facebook and has a cell phone that he uses to "voice text."  (AR 56–57.)  Plaintiff visits his son and gets together with friends to barbecue.  (AR 57–58.)  He last attended church three months before, but prior to that would attend twice or three times a week.  (AR 59.)  Plaintiff testified he previously had a driver's license but he surrendered it due to unpaid child support.  (AR 60–61.)  He believed he would be able to drive if he were licensed.  (AR 61.)

## 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a construction laborer, Dictionary of Operational Titles (DOT) code 869.687-026, which was very heavy exertional work with a specific vocational preparation (SVP)[4] of 2, and as a stock (saw) cutter,

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id.*

DOT code 667.482-018, which was medium exertional work with a SVP of 4.  (AR 67–68.)  The ALJ asked the VE to consider a person of Plaintiff's age, education, and with his work background.  (AR 68.)  The VE was also to assume this person was limited to only stooping, crouching, reaching bilaterally, handling bilaterally, and bilateral fingering frequently.  (AR 68.)  The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform other, medium unskilled jobs in the national economy such as dining room attendant, DOT code 311.677-018, and a linen room attendant, DOT code 222.387-030.  (AR 68–69.)

In a second hypothetical, the ALJ asked the VE to consider a person of Plaintiff's age, education, and with his work background, who can perform jobs at the "light" level.[5]  (AR 69.)  The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform other unskilled, light-level jobs in the national economy such as parking lot attendant, DOT code 915.473-010, SVP 2; office helper, DOT code 239.567-010, SVP 2; and counter clerk, DOT code 249.366-010, SVP 2.  (AR 69–70.)  The ALJ posed a third hypothetical to the VE with the same limitations as the person in the second hypothetical, but with the additional limitation of use of a cane for ambulation, and inquired whether the VE's answer would change.  (AR 70–71.)  The VE testified that any of the jobs identified in response to the second hypothetical could be performed using a cane.  (AR 71.)  In a fourth hypothetical, the ALJ added to the prior hypotheticals an additional limitation of three or more unexcused or unscheduled absences per months, and the VE testified that there would be no work that such individual could perform.  (AR 71.)  Lastly, in the fifth hypothetical, the ALJ added to hypotheticals one through three the additional limitation of the inability to engage and sustain work activity on a regular and continuing basis for eight-hours a day, five days a week, for a 40-hour workweek or the equivalent schedule.  (AR 71–72.)  The VE testified

---

[5] The ALJ defined "light" as

> [S]tanding or walking for about six hours in an eight-hour day, sitting for up to six hours in an eight-hour day, with normal breaks.  Only occasional ladders, ropes, and scaffolds.  Frequent ramps and stairs, balancing, stooping, crouching, kneeling, and crawling.  Reaching is limited to frequent bilaterally.  Handling, that is gross manipulation, is limited to frequent bilaterally.  Fingering, that's fine manipulation of items no smaller than the size of a paper clip, is limited to frequent bilaterally.  Individual should avoid moderate exposure to irritants such as fumes, odors, dust, and gases.  Moderate exposure to poorly ventilated areas.

(AR 69–70.)

there was no work such a person could perform.  (AR 72.)

Plaintiff's attorney asked the VE, in a sixth hypothetical, whether his opinion would change when considering an individual in the first three hypotheticals who was also limited to standing 30 minutes before needing to sit and limited to sitting 30 minutes before needing to change position and stand.  (AR 72–73.)  The VE testified that that the counter clerk job would be "problematic," but that the jobs of office helper and parking lot attendant were "still substantially intact."  (AR 73.) Plaintiff's counsel posed a seventh hypothetical to VE of the same individual as in the prior three hypotheticals with the additional requirement that the person needs to walk for five minutes every 30 minutes in an eight-hour workday.  (AR 73.)  The VE testified that he "would not see significant erosion" for all the previously-identified jobs.  (AR 73.)  Plaintiff's counsel then posed an eighth hypothetical, adding the limitation of lifting less than 10 pounds frequently with the left hand.  (AR 73.)  The VE testified that his opinions would not change.  (AR 73–74.)  The VE testified that the office helper and counter clerk positions require "average literacy," which is "considered sixth grade level."  (AR 74.)

## C.  The ALJ's Decision

In a decision dated March 25, 2016, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 17–28.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920.  (AR 19–28.)  The ALJ decided that Plaintiff had not engaged in substantial gainful activity since October 7, 2013, the application date (Step One).  (AR 19.)  At Step Two, the ALJ found Plaintiff's following impairments to be severe: right knee status post replacement; lumbar spine degenerative disc disease; asthma/COPD; right ankle post ORIF; and obesity.  (AR 19.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (Step Three).  (AR 21.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at Steps Four and Five.  *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . .  We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff

retained the RFC:

> to perform light work, defined in 20 C.F.R. [§] 416.967(b) as standing or walking for about six hours during an eight-hour day and sitting for up to six hours during an eight-hour day, with normal breaks. The individual can only occasionally climb ladders, ropes, and scaffolds; frequently climb ramps and stairs, perform balancing, stooping, crouching, kneeling, and crawling. The individual's reaching is limited to frequent bilaterally; handling, that is gross manipulation, is limited to frequent bilaterally; [and] fingering, that is fine manipulation of items no smaller than the size of a paper clip, is limited to frequent bilaterally. The individual should avoid moderate exposure to irritants such as fumes, odors, dust and gases, [and] moderate exposure to poorly ventilated areas. The individual needs to use a cane for all ambulation.

(AR 21.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" he rejected Plaintiff's subjective testimony as "not entirely credible." (AR 22.)

The ALJ found that Plaintiff could not perform his past relevant work (Step Four), but that, on the basis of the RFC assessment, he retained the capacity to perform other work that existed in sufficient numbers in the national economy, including the jobs of parking lot attendant, office helper, and counter clerk (Step Five). (AR 26–28.) In making this determination, the ALJ noted that Plaintiff was 52 years old on the application date, which is defined as an "individual closely approaching advanced age." (AR 27 (citing 29 C.F.R. § 416.963).)

Plaintiff sought review of this decision before the Appeals Council, which denied review on July 10, 2017, noting that it "considered the borderline age situation in this case" and "found that the factors in the record do not support application of the higher age category." (AR 1–8.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481.

### III.     LEGAL STANDARD

#### A.     Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility [for disability benefits], the Commissioner" is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." *Id.* § 423(d)(2)(B). For purposes of this determination, "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The Ninth Circuit provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 404.1520(a)(4) (providing the "five-step sequential evaluation process"). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue [his] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.      Scope of Review**

"This court may set aside the Commissioner's denial of disability insurance benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098). "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record

that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV. DISCUSSION

Plaintiff contends the ALJ erred in three respects: (1) by giving weight to the consultative examiners' opinions because there was subsequent medical evidence of a total right knee replacement surgery and osteoarthritis that the physicians were unable to review in making their assessments of Plaintiff's functional limitations; (2) by not obtaining a consultative orthopedic examination to determine how this medical evidence impacts Plaintiff's limitations; and (3) by failing to consider Plaintiff was less than six months from entering the advanced age category at the time of the ALJ's decision and therefore on the borderline between age categories for the purposes of applying the Medical-Vocational Guidelines. (*See* Doc. 16.)

Defendant counters that that the ALJ did not have a duty to further develop the record and, with respect to the borderline age issue, that the ALJ satisfied any obligations he had to consider Plaintiff's allegedly borderline age category. (*See* Doc. 24.)

### A. The ALJ's Duty to Develop the Record Further Was Not Triggered.

The claimant bears the burden of proving the existence or extent of an impairment, such that the ALJ's limited "duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001) (citation omitted). *See Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (holding that ALJs have a duty fully and fairly to develop the record when the evidence is ambiguous or "the record is inadequate" to allow for proper evaluation of the evidence). The ALJ must take reasonable steps to ensure that the issues and questions raised by the medical evidence are addressed so that the disability determination may be fairly made on a sufficient evidentiary record, whether favorable or unfavorable to the claimant. *See Tidwell v. Apfel*, 161 F.3d 699, 602 (9th Cir. 1999); *see also* 20 C.F.R. § 416.927(c)(3). When it is necessary to enable the ALJ to resolve a disability issue, the

duty to develop the record may require consulting a medical expert or ordering a consultative examination. *See* 20 C.F.R. § 416.919a. The government is not required to bear the expense of an examination for every claimant, *Reed v. Massanari*, 270 F.3d 838, 842 (9th Cir. 2001), but a consultative examination is normally required where there is an indication of a change in a claimant's condition that is likely to affect the claimant's ability to work, and the current severity of the claimant's impairment is not established. *See* 20 C.F.R. § 416.919a(b)(4). The Commissioner has "broad latitude in ordering a consultative examination." *Reed*, 270 F.3d at 842 (quoting *Diaz v. Sec. of Health and Human Servs.*, 898 F.2d 774, 778 (10th Cir. 1990)).

### 1. Plaintiff's Subsequent Medical Evidence of Knee Replacement Surgery and Osteoarthritis Did Not Trigger the ALJ's Duty to Develop the Record Further.

Plaintiff contends the ALJ improperly relied on the opinions of the consultative examiners in assessing his RFC and ultimately concluding he was not disabled. Specifically, Plaintiff contends Drs. Malik's and Rios's examinations were performed before his May 2015 X-ray that revealed severe osteoarthritis in Plaintiff's right knee as well as before his October 2015 total right knee replacement. Thus, according to Plaintiff, these physicians' opinions were not substantial evidence sufficient to support the ALJ's RFC assessment because they were not "based on a proper evaluation of Plaintiff's right knee symptoms." (Doc. 16 at 7.) Plaintiff asserts that the ALJ could have remedied this error by sending Plaintiff to an orthopedic consultative examination, but failed to do so.

The results of the May 2015 X-ray of Plaintiff's right knee were reviewed by treating physician Dr. Kearns. Upon review of the X-ray, Dr. Kearns referred Plaintiff to an orthopedist, but advised him to use pain reliever "sparingly" and did not prescribe any other treatment or note any additional restrictions on his activities. (AR 470.) Orthopedist, Dr. Casey, recommended in August 2015 that Plaintiff that have a total knee arthroplasty, which he underwent in October 2015. (AR 476.) At the hearing, Plaintiff testified that his knee after the surgery was "sore" but "going pretty good" and "better than it was," and there is no objective medical evidence that his condition worsened post-surgery. (AR 48.) The surgery records do not show that any exertional or non-exertional limitations, nor did Plaintiff testify he was given any. If there were any necessary

limitations arising because of the surgery, Plaintiff's treating orthopedist would have indicated this in the discharge notes, but no such limitations were noted.

Instead, at the time of discharge, Plaintiff was prescribed aspirin and Norco and was advised to bear weight as tolerated. (AR 484.) He was also observed able to ambulate more than 500 feet. (AR 484.) Plaintiff had an "uneventful postoperative course" and attended physical therapy both inside and outside of the home for several months. (AR 63, 484, 500.) Plaintiff points to no evidence showing that his condition worsened or his limitations were greater because of the surgery. *See Benjamin v. Colvin*, Case No. 15-cv-02995-NJV, 2016 WL 4074141, at *5 (N.D. Cal. Aug. 1, 2016) (finding the medical record adequate for the ALJ to determine the plaintiff's RFC, even though the plaintiff had surgery five months before the ALJ's decision, because there was no indication in the record that the surgery was unsuccessful or that the plaintiff would not recover); *Miller v. Colvin*, No. 1:12-cv-2063-SKO, 2014 WL 3735345, at *10 (E.D. Cal. July 28, 2014). Rather, as the ALJ noted, the medical record, including Plaintiff's own testimony, establishes that he recovered well and received conservative—and infrequent—treatment following surgery. (AR 23, 25–26, 48, 63, 484, 500–01.) *See Gragert v. Colvin*, No. CV 15–118–M–DLC–JCL, 2016 WL 6072369, at *6 (D. Mont. Aug. 31, 2016) (finding that medical record was neither ambiguous or inadequate, and therefore the ALJ was not required to further develop by ordering a consultative examination, where the ALJ "discussed the medical records at length in his decision, and pointed to specific evidence showing that [the plaintiff] experienced medical improvement as of July 2013 because he had recovered from his hernia surgeries and his liposarcoma, and Hodgkin's disease were in complete remission").

Moreover, it is unclear, and Plaintiff does not articulate, how Plaintiff's May 2015 X-ray and October 2015 knee replacement surgery render the medical record either inadequate or incomplete, apart from the fact that they occurred after Drs. Malik and Rios rendered their opinions. That other medical evidence was produced after the date of the physicians' opinions, however, does not alone render them stale. Instead, the ALJ must evaluate their consistency with the entire record, including any evidence produced after the physicians' opinions were issued. *See* Social Security Ruling ("SSR") 96-6p, 1996 WL 374188, at *2. The ALJ did so: he gave only partial weight to Dr.

Malik's overall opinion and expressly rejected the finding that Plaintiff had no lifting or carrying limitation and did not require ambulation with a cane because it was "inconsistent with [Plaintiff's] right knee and ankle impairments status post-surgery, and [Plaintiff's] report of ambulation with a cane." (AR 25.) Similarly, although he gave Dr. Rios's opinion "great weight," the ALJ departed from the opinion by "provid[ing] for . . . ambulation with a cane based on [Plaintiff's] reports." (AR 26.) Upon a complete evaluation of the evidence, the ALJ determined that the record was adequate to make a determination and considered the consultative examiners' opinions with the other evidence in the record. He then adopted a *more limited* RFC than either Dr. Malik or Rios had opined, considering the more recent evidence of Plaintiff's right knee surgery and his testimony of ambulation with a cane (which both pre- and post-dated his right knee surgery). (AR 21, 25–26, 49, 62, 65, 484, 500–01.)

In sum, the May 2015 X-ray findings and the October 2015 right knee replacement surgery were properly considered by the ALJ and did not indicate Plaintiff's condition or physical limitations had worsened because of the surgery. *See Benjamin*, 2016 WL 4074141, at \*5; *Miller*, 2014 WL 3735345, at \*10. *Cf. Gragert*, 2016 WL 6072369, at \*6. Because the record was neither ambiguous nor inadequate to allow for proper evaluation of the evidence, the Court concludes that the ALJ had no duty to further develop the record with a consultative orthopedic examination. *See Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (duty not triggered where ALJ did not make finding that medical report was inadequate to make disability determination). *See also, e.g., Kocher v. Colvin*, No. 3:14–cv–00608–MMD–VPC, 2015 WL 6956529, at \*6 (D. Nev. Sept. 29, 2015) (finding that, "[w]hile an additional consultative examination would have been helpful" following the plaintiff's ORIF surgery, the ALJ "did not shirk her duty to develop the record" where she discussed the medical treatment received and "explicitly referred to [the plaintiff's] ongoing symptoms" post-surgery.); *Wyatt v. Colvin*, No. CV 12–3672–JPR, 2013 WL 3233330, at \*11 (C.D. Cal. June 25, 2013). *Compare, Sepulveda v. Astrue*, No. EDCV 09-2034 RNB, 2010 WL 2990111, at \*1 (C.D. Cal. July 28, 2010) (finding that ALJ erred by not ordering the plaintiff to undergo a consultative examination "where there was insufficient medical evidence in the record to determine [the] plaintiff's post-surgery status," resulting in a decision that was "based on pure conjecture.")

### 2. The ALJ Was Entitled to Rely on the 2014 Examining Physicians' Opinions in Assessing Plaintiff's RFC.

As noted above, the ALJ gave "partial weight" to the opinion of Dr. Malik, finding it "consistent with Plaintiff's severe impairments with conservative and infrequent treatment since surgery and subjective reports of symptoms," except for the lack of lifting and carrying limitation and requirement of ambulation with a cane, to which the ALJ assigned "little weight." (AR 25.) The ALJ also found that Plaintiff's obesity, lumbar degenerative disc disease, asthma, and COPD caused greater limitations with respect to Plaintiff's ability to climb and to be exposed to irritants and poorly ventilated areas. (AR 25–26.) The ALJ gave "great weight" to Dr. Rios's opinion, finding it "consistent with the examination and the medical record, indicating a history of surgery of the right ankle and knee, but with infrequent subsequent treatment, and asthma and [COPD] treated with medication, as well as obesity." (AR 26.)

Plaintiff contends that the consultative examiners' opinions were not "substantial evidence" sufficient to support the RFC because they assessed him in 2014 and their opinions did not account for Plaintiff's May 2015 X-ray findings or his October 2015 right knee replacement surgery. That other medical evidence was produced after the date of the physicians' opinions does not alone render them stale. Instead, the ALJ must evaluate their consistency with the entire record, including any evidence produced after the physicians' opinions were issued. *See* 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); Social Security Ruling ("SSR") 96-6p, 1996 WL 374188, at *2. *See also Brown v. Colvin*, No. CV 14-4420-JPR, 2015 WL 3823938, at *8 n.9 (C.D. Cal. June 19, 2015) ("[T]he relevant issue in evaluating an examining physician's opinion is not whether he reviewed the claimant's medical records but whether his opinion was consistent with those records.")

Here, Plaintiff fails to articulate how the May 2015 X-ray findings and the October 2015 surgery treatment notes specifically undermine the opinions of these physicians as credited by the ALJ. Notably, Plaintiff does not challenge the ALJ's finding that Plaintiff received only "conservative" and "infrequent treatment" following his knee replacement surgery, nor does he challenge the ALJ's discrediting of his subjective reports of symptoms, which the Court considers

binding. *See, e.g., Stanley v. Astrue*, No. 1:09–cv–1743 SKO, 2010 WL 4942818, at *6 (E.D. Cal. Nov. 30, 2010). The ALJ did not err by giving Dr. Malik's and Rios's opinions weight simply because evidence was produced after their opinions were issued. *See Romanyuk v. Berryhill*, NO. C17-0030RSL, 2017 WL 3424965, at *5 (W.D. Wash. Aug. 9, 2017). As discussed above, the April 2010 X-ray findings and the June 2011 surgery treatment notes do not create an ambiguity with respect to the medical evidence and Plaintiff's degree of limitation. Those subsequent records therefore do not render the prior examiners' opinions less probative or undercut their value as substantial evidence upon which the ALJ was entitled to rely. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (finding that examining physician's "opinion alone constitutes substantial evidence" supporting RFC assessment "because it rests on his own independent examination of" claimant); *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (when "opinion of a nontreating source is based on independent clinical findings," it "may itself be substantial evidence"). Moreover, the ALJ based his RFC finding not only on Dr. Malik's and Dr. Rios's opinions but also his own "careful consideration of the entire record," and his RFC finding was in fact more restrictive than the consultative examiners' assessments. (AR 21; *see* AR 21–26 (summarizing records and opinion evidence from October 2013 to January 2016).) Plaintiff does not establish harmful error in the ALJ's RFC assessment, which is based on substantial evidence from the record. *See Thomas*, 278 F.3d at 957.

**B.    The ALJ Properly Considered Plaintiff's Age at Step Five.**

Plaintiff contends that the ALJ erred at Step Five by failing to apply properly the Medical–Vocational Guidelines, 20 CFR, Part 404, Subpart P, Appendix 2 ("the Grids") in this "borderline" age case. Specifically, Plaintiff contends that at the time of the ALJ's decision he was fewer than six months from moving into a higher age category and, therefore, in accordance with the Commissioner's Program Operations Manual System (POMS) DI 25015.006, the ALJ should have considered the applicability of the higher age category in light of Plaintiff's limitations and found him disabled under Grid Rule 202.02. (Doc. 16 at 7–8.)

Defendant notes that the ALJ considered whether to place Plaintiff in an older age category, which is all that is required under the law. Specifically, Defendant contends that the ALJ chose

not to apply the Grids, but instead properly relied on the testimony of a VE to identify jobs that Plaintiff could perform. (Doc. 24 at 8–9.)

**1.    Legal Standard**

A claimant makes a prima facie showing of disability where, as here, the claimant has established that he suffers from a severe impairment that prevents him from doing past work. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir.1999). Once the claimant makes such a showing, at Step Five of the disability analysis, the Commissioner bears the burden of "show[ing] that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.* A claimant's "residual functional capacity," is defined as the most that a claimant can do despite "physical and mental limitations" caused by his impairments and related symptoms. 20 C.F.R. § 416.945(a)(1). The ALJ then considers potential occupations that the claimant may be able to perform. *See* 20 C.F.R. § 416.966. The Commissioner can meet this burden in one of two ways: "(a) by the testimony of a vocational expert, or (b) by reference to the Grids." *Tackett*, 180 F.3d at 1101. *See also Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010).

The Grids are matrices of the "four factors identified by Congress—physical ability, age, education, and work experience-and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Heckler v. Campbell*, 461 U.S. 458, 461–62, 103 (1983). For purposes of applying the Grids, there are three age categories: younger person (under age 50), person closely approaching advanced age (age 50–54), and person of advanced age (age 55 or older). 20 C.F.R. § 416.963(c)–(e). The regulation in relevant section provides:

> We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

*Id.* § 416.963(b). *See also* POMS DI 25015.006 at B ("We do not have a more precise programmatic definition for the phrase 'within a few days to a few months.' The term 'a few' is defined using its ordinary meaning, a small number. Usually, we consider a few days to a few months to mean a

period not to exceed 6 months.'"). In a "borderline situation," "an ALJ is not *required* to use an older age category, even if the claimant is within a few days or a few months of reaching an older age category." *Lockwood*, 616 F.3d at 1071 (emphasis in original). Rather, the ALJ is required by regulation only to *consider* whether to use an older age category. *Id.* at 1070.

**2. Analysis**

In *Lockwood*, the claimant was one month and three days from turning 55 years of age and becoming an individual of advanced age under the governing regulations. *Id*. at 1069–70. The ALJ's decision, without explanation, did not apply the advanced age category to the claimant and instead treated the claimant as merely a person closely approaching advanced age. *Id*. at 1070. The district court affirmed the ALJ's decision. *Id*. On appeal, the Ninth Circuit held that the ALJ did not err by failing to address in her written decision why she did not apply the higher age category. *Id*. In this regard, the Ninth Circuit in *Lockwood* stated as follows:

> Here, the ALJ satisfied the requirement that she consider whether to use the older age category. The ALJ mentioned in her decision Lockwood's date of birth and found that Lockwood was 54 years old and, thus, a person closely approaching advanced age on the date of the ALJ's decision. Clearly the ALJ was aware that Lockwood was just shy of her 55th birthday, at which point she would become a person of advanced age. The ALJ also cited to 20 C.F.R. § 404.1563, which prohibited her from applying the age categories mechanically in a borderline situation. Thus, the ALJ's decision shows that the ALJ knew she had discretion to use the older age category after evaluating the overall impact of all the factors of Lockwood's case. 20 C.F.R. § 404.1563(b). Finally, we are satisfied the ALJ did not apply the age categories mechanically because the ALJ evaluated the overall impact of all the factors of Lockwood's case when the ALJ relied on the testimony of a vocational expert before she found Lockwood was not disabled. Id.

*Id*. at 1071–72.

Here, as in *Lockwood*, the ALJ's decision acknowledged Plaintiff's date of birth and noted that plaintiff was a person closely approaching advanced age. (AR 27.) The ALJ observed at the hearing on March 8, 2016, that Plaintiff was 54 years old, indicating the ALJ's awareness that Plaintiff was months away from turning 55. (AR 39.) The ALJ also cited to 20 C.F.R. § 416.963, the pertinent regulation prohibiting him from applying the age categories mechanically in a borderline situation, in his decision. (AR 27.) Finally, the ALJ also evaluated the overall impact of the facts of plaintiff's case in relying on the testimony of the VE before finding that Plaintiff was

not disabled.  (AR 27–28, 66–74.)

Plaintiff is incorrect that neither the ALJ nor the Appeals Council "failed to consider or acknowledge" the borderline age issue: in its denial of review, the Appeals Council explicitly stated, "We considered the borderline age situation in this case, and we found that the factors in the record do not support application of the higher age category."  (AR 2.)  Plaintiff does not assert that the "factors in the record" support the application by the ALJ of the "advanced age" category, nor does he acknowledge—much less distinguish—*Lockwood*, the controlling Ninth Circuit authority on this issue.  Instead, Plaintiff relies exclusively on POMS rule DI 25015.006, which he contends necessitates the application of the "advanced age" category to find him disabled under Grid Rule 202.02 because he turned 55 years old within six months of the ALJ's decision.  (*See* Doc. 16 at 7–8.)  However, the Ninth Circuit in *Lockwood* explicitly noted that POMS "constitutes an agency interpretation that does not impose judicially enforceable duties on either this court or the ALJ."  *Id.* at 1073.  Plaintiff fails to demonstrate why reliance on the identified POMS guidance—which became effective after the date of the ALJ's decision—is required in this case.  *See Dattilo v. Berryhill*, Case No. 5:16-CV-05552-HRL, 2018 WL 827907, at *8–9 (N.D. Cal. Feb. 12, 2018) (declining to find the ALJ erred in not following POMS rule DI 25015.006 in a borderline age situation where the ALJ's decision demonstrated that the ALJ knew "[he] had discretion to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case") (quoting *Lockwood*, 616 F.3d at 1072) (internal quotations omitted)).

Accordingly, the Court finds the ALJ did not err at Step Five by failing to explain in his decision why he used Plaintiff's chronological age instead of applying the higher age category under the Grids.  *See Lockwood*, 616 F.3d at 1074; *Flash v. Colvin*, Case No. 1:14–cv–01885–BAM, 2016 WL 1086886, at *6 (E.D. Cal. Mar. 21, 2016) (ALJ sufficiently considered claimant's borderline age under *Lockwood* by setting forth claimant's birth date, citing and acknowledging sections 416.963 and 404.1563, and relying on the testimony of a VE); *Gyulnazaryan v. Astrue*, No. 1:11–cv–1790 GSA, 2012 WL 5198504, at *10–11 (E.D. Cal. Oct.19, 2012) ("As the Ninth Circuit found in *Lockwood*, the regulation merely promises claimants that the Social Security Administration will consider veering from the chronological-age default in borderline situations."); *Perez v. Astrue*, No.

1:10–cv–01471-SKO, 2012 WL 28639, at *6 (E.D. Cal. Jan. 5, 2012) ("The ALJ properly set forth Plaintiff's birth date in his decision, cited and acknowledged § 404.1563, and relied on the testimony of a VE indicating that the ALJ did not mechanically apply the age categories. This was sufficient consideration of Plaintiff's borderline age pursuant to § 404.1563 and the Ninth Circuit's holding in *Lockwood*.").

## V.    CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **November 27, 2018**                    /s/ *Sheila K. Oberto*
                                                UNITED STATES MAGISTRATE JUDGE